**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  08 CR 417 |
| | ) | |
| ALFRED L. WOLFF GMBH et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Defendants Alfred L. Wolff GmbH ("ALW GmbH"), Alfred L. Wolff Honey GmbH ("ALW Germany"), Alfred L. Wolff Co., Ltd. (Hong Kong) ("ALW Hong Kong"), and Alfred L. Wolff (Beijing) Trade Co., Ltd. ("ALW Beijing") (collectively, "Foreign ALW Defendants") have filed a motion pursuant to Federal Rule of Criminal Procedure 12(b) to quash service of summons of the indictment.  (R. 129.)  In their motion, the Foreign ALW Defendants contend that the government's attempt to serve them with the summonses for the underlying criminal matter did not comply with Federal Rule of Criminal Procedure 4.  The Court agrees and grants the Foreign ALW Defendants' motion.

**BACKGROUND**

On August 31, 2010, a federal grand jury returned a forty-four count indictment charging the Foreign ALW Defendants–along with Alfred L. Wolff, Inc. ("ALW USA"), various executives of the ALW Defendants[1] (hereinafter, the "Executive Defendants"), and others–with

---

[1]  In this opinion, the Court uses the term "Foreign ALW Defendants" to refer to the corporate defendants bringing this motion: ALW GmbH, ALW Germany, ALW Hong Kong, and

fraudulently avoiding nearly $80 million in customs duties on honey they imported into the United States between January 2002 and January 2009, and related offenses. Count I of the indictment charges the ALW Defendants, the Executive Defendants and others with conspiracy to defraud the United States, in violation of 18 U.S.C. §§ 371 and 2, by (i) unlawfully importing Chinese-origin honey, in violation of 18 U.S.C. § 542, (ii) selling and facilitating the transportation and sale of Chinese-origin honey knowing that it had been unlawfully imported, in violation of 18 U.S.C. § 545, (iii) introducing and delivering adulterated honey into interstate commerce, in violation of 21 U.S.C. §§ 331(a), 333(a)(2), 342(a)(2)(C)(i), and 348(a), and (iv) obstructing an investigation by the U.S. Department of Commerce, in violation of 18 U.S.C. § 1519. The remaining forty-three counts in the indictment charge the defendants directly with the individual offenses underlying the conspiracy charge.

Pursuant to Federal Rule of Criminal Procedure 9, the government requested – and the Court issued – a summons for each of the corporate ALW Defendants named in the indictment. (R. 94, 9/13/10 Minute Entry.) The government was then obligated to serve the corporate defendants in accordance with Rule 4(c)(3)(C), which provides:

> A summons is served on an organization by delivering a copy to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process. A copy must also be mailed to the organization's last known address within the district or to its principal place of business elsewhere in the United States.

Fed. R. Crim. P. 4(c)(3)(C). As discussed in greater detail below, ALW USA's attorneys voluntarily accepted service of the summons on its behalf and ALW GmbH (ALW USA's parent company and sole shareholder) appointed, via shareholder resolution, a limited-authority

---

ALW Beijing. The Court will use the term "ALW Defendants" when referring the Foreign ALW Defendants and ALW USA.

2

corporate representative for the limited purpose of appearing in this Court to enter a not guilty plea on behalf of ALW USA. That limited-authority corporate representative appeared at ALW USA's January 21, 2011 arraignment and entered a plea of not guilty. Immediately following ALW USA's arraignment, the government served ALW USA's limited-authority corporate representative with summonses for each of the Foreign ALW Defendants. At issue in this motion is whether the government's service of the summonses on the limited-authority ALW USA corporate representative satisfies the requirements in Rule 4(c)(3)(C) and comprises a valid service of summons on the Foreign ALW Defendants.

Before reaching that analysis, the Court reviews the relationships between ALW USA and each of the Foreign ALW Defendants. Notably, the indictment does not specifically allege the relationship between any of the entities except ALW GmbH and ALW USA. The indictment states that ALW GmbH wholly owned ALW USA, its U.S. subsidiary. (R. 85, Indictment at 3 ¶ 5.) With regard to the other ALW Defendants, the indictment merely states that "ALW [GmbH] had subsidiaries, affiliates, and representative offices located throughout the world . . . and those four subsidiaries and affiliates acted in concert" to commit the alleged unlawful acts. (*Id*. at 2 ¶ 2.) Then, in describing each entity – again, with the exception of ALW USA, which the indictment explicitly notes "became wholly owned by ALW [GmbH] in or about 2003" (*id*. at 3 ¶ 5) – the indictment simply sets forth the entity's principal place of business and its general role in the conspiracy. *See* Indictment at 2 ¶ 4 (ALW Germany had its principal place of business in Hamburg, Germany), *id*. at 3 ¶ 6 (ALW Beijing had its principal place of business in Beijing, China), *id.* ¶ 7 (ALW Hong Kong had its principal place of business in Hong Kong). The indictment does not describe the relationship of the other entities to ALW GmbH – or, for that

matter, to ALW USA.

## I.      ALW GmbH

As alleged in the indictment, ALW GmbH was a German international trading company that purchased, imported, exported, distributed, sold, and processed food products, including honey.  (Indictment at 1 ¶ 1.)  ALW GmbH had "subsidiaries, affiliates, and representative offices located throughout the world," including ALW Germany, ALW USA, ALW Beijing, and ALW Hong Kong.  (*Id*. at 2 ¶ 2.)  ALW GmbH and its subsidiaries and affiliates acted in concert to acquire and purchase honey from China and other countries, to import the honey into the United States, and to sell it to U.S. consumers.  (*Id*.)  ALW GmbH "exercised control over [the subsidiaries and affiliates] through its managers, executives and employees."  (*Id*. at 2 ¶ 3.)

## II.     ALW USA

ALW USA was incorporated in Delaware and had its principal place of business in Illinois.  (*Id*. at 3 ¶ 5.)  ALW USA became wholly owned by ALW GmbH in or about 2003, and was the ALW Defendants' U.S. operating unit.  (*Id*.)  ALW USA "imported and caused to be imported into the U.S. full container loads [] of honey and related commodities from China and other countries that it sold to U.S. domestic customers, including food manufacturers, processors, distributors, and packers."  (*Id*.)

## III.    ALW Germany

ALW Germany had its principal place of business in Germany and operated the ALW Defendants' honey business in Europe.  (*Id*. at 2 ¶ 4.)  The indictment does not state the corporate relationship between ALW Germany and ALW GmbH, ALW USA, or any of the other ALW Defendants.

IV.     **ALW Beijing**

ALW Beijing had its principal place of business in Beijng, China.  (*Id*. at 3 ¶ 6.)  ALW

Beijing arranged on behalf of the ALW Defendants to obtain Chinese-origin honey from

suppliers in China for importation and sale to the United States.  (*Id*.)  The indictment does not

state the corporate relationship between ALW Beijing and ALW GmbH, ALW USA, or any of

the other ALW Defendants.

V.      **ALW Hong Kong**

ALW Hong Kong had its principal place of business in Hong Kong, China.  (*Id*. at 3 ¶ 7.)

ALW Hong Kong "coordinated on behalf of [the ALW Defendants for] the purchase, finance,

and shipment of honey and related products of Chinese origin for importation to the United

States."  (*Id*.)  The indictment does not state the corporate relationship between ALW Hong

Kong and ALW GmbH, ALW USA, or any of the other ALW Defendants.

VI.     **Additional Information Regarding the ALW Defendants**

To supplement the indictment's allegations regarding the ALW Defendants'

relationships, the parties represent that ALW Germany and ALW Hong Kong are wholly owned

subsidiaries of parent company ALW GmbH.  Although the Foreign ALW Defendants represent

that ALW Hong Kong wholly owns subsidiary ALW Beijing and the government represents that

ALW GmbH wholly owns subsidiary ALW Beijing, that discrepancy is not relevant for the

present analysis – it is sufficient to note that ALW Beijing is a subsidiary of parent company

ALW GmbH.

The corporate relationships now established, the Court turns to its analysis of the Foreign

ALW Defendants' motion to quash service of the summonses.

5

## ANALYSIS

"Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350, 119 S.Ct. 1322, 143 L.Ed.2d 448 (1999). Indeed, the notion that "[a]n individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process" is a "bedrock principle" of our legal system. *Id*. at 344. In order to effectuate service of process on a corporate defendant in a criminal matter, the government must deliver a copy of the summons to "an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process." Fed. R. Crim. P. 4(c)(3)(C). The government must also mail a copy of the summons to the corporate defendant's last known address within the district, or to its principal place of business elsewhere in the United States. *Id*.

In their motion to quash service of the summonses, the Foreign ALW Defendants contend that the government failed to comply with Rule 4(c)(3)(C) when it handed copies of the summonses to ALW USA's limited-authority corporate representative on January 21, 2011. The Foreign ALW Defendants deny that corporate representative's authority to accept service of the summonses because he was appointed for the sole purpose, and with the singular authority, of representing ALW USA – and even there, in a limited capacity (i.e., to enter a not guilty plea on behalf of ALW USA). In addition, the Foreign ALW Defendants cite well-settled civil case law that states that service on a subsidiary does not constitute service on a corporate parent where separate corporate identities are maintained, even if the subsidiary is wholly-owned by the parent. *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336-37, 45 S.Ct. 250, 69 L.Ed.

6

634 (1925). *See also United States v. Bestfoods*, 524 U.S. 51, 61-2, 119 S.Ct. 1876, 141 L.Ed.2d

43 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal

systems' that a parent corporation . . . is not liable for the acts of its subsidiaries.") (collecting

cases). The Foreign ALW Defendants assert that ALW USA's corporate existence "has always

been completely distinct from ALW Hong Kong, ALW Beijing, and ALW Honey," *see* R. 130 at

6, and argue that they not only maintain separate existences (from each other and from ALW

USA), but that the government has not alleged facts to suggest the contrary in the indictment.

The government contends that it properly served the Foreign ALW Defendants when it

served the summonses on ALW USA's limited-authority corporate representative, and

furthermore, that it fully complied with the Rule 4 requirements when it sent copies of the

summonses via certified mail to ALW USA's last known address within the District.[2] The

government acknowledges the black letter law that a litigant cannot ordinarily serve a parent

company via its wholly-owned subsidiary, but contends that it has alleged sufficient facts to

warrant a finding that (i) the interests of justice permit the Court to consider such service valid,

and (ii) ALW USA operated as the Foreign ALW Defendants' alter ego, thus rendering the

service on ALW USA valid and proper as to the Foreign ALW Defendants.[3]

---

[2] In an affidavit submitted in support of the government's response, Special Agent
Matthew Gauder states that he "personally sent by Certified Mail summonses properly issued by
the Clerk of this Court to . . . (1) Mr. Donald DeLucca, the appointed corporate representative of
[ALW USA], . . . (2) Mr. Thomas Stein, ALW USA's 'temporary general manager' registered
with the Illinois Secretary of State as of February 4, 2010, . . . and (3) Mr. William Cook,
attorney for ALW USA." (R. 139-2, Gauder Affidavit, ¶ 4.) Gauder received a return receipt for
each of those mailings. (*Id.*)

[3] The government has not demonstrated why it cannot pursue established channels in
order to serve the summonses on the foreign corporate defendants. In the government's briefing
on a previous motion regarding ALW USA's arraignment in this criminal matter, it cited – and

I.      **The Government's Veil Piercing Argument**

The government does not dispute the Foreign ALW Defendants' argument that *absent* special findings, the government's service of the summonses on ALW USA did not comply with Rule 4(c)(3)(C). Instead, it asks the Court to disregard the plain language of Rule 4(c)(3)(C) and extend the application of the civil "alter ego" doctrine to this criminal matter in order to obtain jurisdiction over foreign corporate criminal defendants. No Court of Appeals or court in this District has adopted this approach.

The government cites to two district court opinions, *United States v. Chitron Electronics*

_____

supplied the Court with excerpts from – the United States's Mutual Legal Assistance Treaty ("MLAT") with Germany. *See* R. 110-1, Ex. 3 to Govt. Resp. to Mem. Re: Appearance. As its title suggests, the MLAT is a treaty between the United States and Germany concerning "mutual legal assistance in criminal matters." *Id*. at 6. The MLAT excerpt submitted by the government in its previous filing reveals that the MLAT obligates the United States and Germany to "afford each other . . . the widest measure of mutual assistance in criminal investigations and proceedings, including those relating to customs, duties and taxes." *Id*. at 9. "Assistance shall include: 1. locating or identifying persons or items; 2. serving documents." *Id*. Furthermore, as described in its Table of Contents, Article 4 of the MLAT provides for "Serving Documents." *Id*. at 2. Given these MLAT provisions, it appears the government can effectuate service in compliance with Rule 4. The government has not suggested that it has even attempted to serve the German corporations (ALW GmbH and ALW Germany) pursuant to the MLAT, or that service pursuant to the MLAT would cause any significant burdens.

As to the other ALW subsidiaries, according to the U.S. Department of State website, (1) the United States maintains an agreement with Hong Kong on Mutual Legal Assistance in Criminal Matters, *see* http://www.state.gov/documents/organization/169274.pdf ("Treaties in Force 2011 – Bilateral Treaties in Force as of Jan. 1, 2011" at 55), (2) the United States maintains an agreement with China on Mutual Legal Assistance in Criminal Matters, *see* http://www.state.gov/documents/organization/169274.pdf ("Treaties in Force 2011 – Bilateral Treaties in Force as of Jan. 1, 2011" at 53), and (3) if the United States does not currently maintain a treaty or agreement with a foreign government, "[l]etters rogatory are the customary method of obtaining judicial assistance from abroad . . . [and] may be used . . . to effect service of process," *see* http://travel.state.gov/law/judicial/judicial_683.html (last visited on Aug. 10, 2011). Again, the government has not suggested that it has even attempted to pursue these methods of service on the foreign corporations, or that it *cannot* serve the foreign corporations, individually, in compliance with Rule 4(c)(3)(C).

*Co. Ltd.*, 668 F. Supp. 2d 298 (D. Mass. 2009) and *United States v. The Public Warehousing Co.*,

No. 09-CR-490-TWT, 2011 WL 1126333 (N.D. Ga. Mar. 28, 2011), that have permitted this

extension.  Even if the Court adopted those courts' approach to the issue – and the Court need

not take a position on the approach at this juncture – given the facts before the Court, the

government has not met its heavy burden under a veil piercing analysis.

      **A.**      **A Veil Piercing Analysis Fails on the Facts Before the Court**

      As the *Chitron* court acknowledged, "[t]he case law discussing the specific issue of

personal jurisdiction over foreign corporations in the criminal context is surprisingly sparse and

poorly developed."  *Chitron*, 668 F.Supp.2d at 302.  Even if the Court were to conduct an

analysis similar to that of the *Chitron* court, as the government requests, its service of the

summonses on ALW USA still fails.  The government's contention that "the pervasiveness and

totality of the ALW [Defendants'] criminal activities forecloses an attempted adherence to

corporate fiction" (R. 139, Govt. Resp. at 7) does not find sufficient support in the facts

presented to the Court.

      **1.**      **The facts do not support the government's contentions**

      The government insists that the "interests of justice" permit the Court to disregard the

corporate form in this case because "[h]ere, the very formation and operation of the constituent

members of the [ALW Defendants] – including the [Foreign ALW Defendants] – was to

perpetrate a fraud on the United States."  (*Id*. at 11.)  In support, under a subject heading entitled

"Corporate Form Does Not Override the Grand Jury's Findings: ALW Food Group is a Criminal

Enterprise Whose Fraud Subjects the [Foreign ALW Defendants] to Service Through ALW

USA" (*id*. at 9), the government cites the grand jury's charge that the "purpose of the conspiracy

was to fraudulently import and enter Chinese-origin honey into the United States to avoid the payment of antidumping duties . . . " *Id*. at 11 (quoting Indictment at 12 ¶ 42). The government also cites the grand jury's finding that the ALW Defendants "acted in concert" to commit the charged crimes, *see id*. at 13 (quoting Indictment at 2 ¶ 2), and additional grand jury findings that the government characterizes as demonstrating that the ALW Defendants "benefitted for years from a business model predicated on fraud and corruption upon the U.S. marketplace by, through, and with ALW USA." *Id*. at 14.[4]

Having carefully reviewed the indictment, the government's conclusion that the constituent members of the ALW Defendants were formed to perpetrate a fraud on the United States is not supported. As the government notes, the indictment contains allegations regarding the fraudulent "purpose of the *conspiracy*" (Indictment at 12 ¶ 42, emphasis added) and the manner by which the ALW Defendants and ALW Executives "acted in concert" (*id*. at 2 ¶ 2). The grand jury did not find that ALW GmbH fraudulently formed and operated ALW USA (or any of the other Foreign ALW Defendants) for the purpose of perpetrating a fraud. Nothing in the indictment, in Special Agent Gauder's affidavit, or in the materials filed under seal by the government, suggests that any of the Foreign ALW Defendants formed ALW USA "to perpetrate a fraud on the United States," as the government now contends. *See* R. 139, Govt. Resp. at 11.

The Foreign ALW Defendants' reply brief and the materials submitted therewith further

---

[4] One point of clarity: the indictment does not charge any of the defendants in this matter under the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. §§ 1961 *et seq*. Although the government's brief and Special Agent Gauder's affidavit repeatedly refer to the corporate defendants as comprising or participating in a "criminal enterprise"–language typically used to refer to RICO conspiracies, as defined at 18 U.S.C. § 1961(4)–the indictment charges the Foreign ALW Defendants and others with conspiracy to defraud the United States as specified above.

undermine the government's assertions.  It is uncontested that ALW USA was formed two years <u>before</u> the United States implemented anti-dumping duties on Chinese-origin honey, and thus could not have been formed for the purpose of avoiding those duties, for they did not yet exist. Several other facts undermine the government's argument: (1) although ALW USA imported and sold honey as part of its business, that was not the entirety of ALW USA's business – ALW USA "bought and sold a wide range of non-honey food products," none of which have been implicated in this criminal matter or (to the Court's knowledge) were alleged to be anything other than legitimate; (2) with the exception of startup financing and contributions from parent company ALW GmbH, ALW USA financed its operations independently, on its own credit and by pledging its own assets as collateral; (3) ALW USA prepared its own audited annual financial statements through local auditors that it independently retained and paid; (4) ALW USA reinvested its earnings and cash flow into its own business, to expand its operations; (5) ALW USA controlled its employee hiring and payroll decisions; and (6) ALW USA purchased its inventory from a variety of suppliers, including many that were unrelated to the Foreign ALW Defendants, and established its own commercial relationships throughout the United States.  (R. 150, Reply Brief at 3.)

### 2. The government has not met its burden under a veil piercing analysis

The Court recognizes that under Delaware law,[5] a litigant attempting to pierce the

---

[5] "As a general matter, the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation."  *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983).  *See also United States v. Castellano*, 349 F.3d 483, 486 (7th Cir. 2003) ("Unless some federal statute or regulation addresses the subject, the relation among corporations, managers, and investors is governed by state corporate law even when the claim rests on federal law.").  Because ALW USA was incorporated in Delaware, the Court applies Delaware law to this analysis.

corporate veil "need not prove that the corporation was created with fraud or unfairness in mind. It is sufficient to prove that it was so used." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168 (2d Cir. 2008) (collecting cases). Even under this standard, however, the government has not met its burden. Despite its allegations regarding the coordinated efforts of ALW USA and the Foreign ALW Defendants, the government has not produced sufficient facts to permit the Court to conclude that the corporate structure was used for fraudulent purposes. *See Bestfoods*, 524 U.S. at 62 ("the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf."). Also, although the indictment charges the ALW Defendants with conspiring to commit fraud, "[t]he underlying cause of action does not supply the necessary fraud or injustice" required to pierce the corporate veil. *Southeast Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 674 (6th Cir. 2006) (applying Delaware corporate law and citing *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 295 (D.Del. 2000) ("In order to prevail on a claim to pierce the corporate veil . . . a plaintiff must prove that the corporate form causes fraud or similar injustice."); *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996) ("[T]he alter ego theory requires that the corporate structure cause fraud or similar injustice[;]" thus, "[m]ere dominion and control of the parent over the subsidiary [alone] will not support alter ego liability."); *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice. Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.") (footnote and internal quotations omitted)). "To hold otherwise would

12

render the fraud or injustice element meaningless, and would sanction bootstrapping." *Id.* (citing *Outokumpu Eng'g Enters.*, 685 A.2d at 729 ("The 'injustice' must be more than the breach of contract alleged in the complaint")).

     "It is a bedrock principle of corporate law in Delaware and elsewhere that courts must respect entity separateness unless doing so would work inordinate inequity." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 371 (3d Cir. 2007). "The principle of piercing the fiction of the corporate veil is to be applied with great caution and not precipitately, since there is a presumption of corporate regularity," and "[t]he party wishing to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to this equitable relief." *Prime Hospitality Corp.*, 462 F.3d at 675 (internal quotations and citations omitted). "Numerous factors come into play when discussing whether separate legal entities should be regarded as alter egos." *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D.Del. 1990), *aff'd*, 932 F.2d 959 (3d Cir.1991). These factors include:

> whether the corporation was adequately capitalized for the corporate undertaking;
> whether the corporation was solvent; whether dividends were paid, corporate records
> kept, officers and directors functioned properly, and other corporate formalities
> were observed; whether the dominant shareholder siphoned corporate funds; and whether, in
> general, the corporation simply functioned as a facade for the dominant shareholder.

*NetJets Aviation, Inc.*, 537 F.3d at 177 (citation omitted). No single factor is determinant, and "[t]he legal test for determining when a corporate form should be ignored in equity cannot be reduced to a single formula." *Id.* (citing *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del. Ch. 1987)). "Simply phrased, the standard may be restated as: 'whether [the two entities] operated as a single economic entity such that it would be inequitable for th[e] Court to uphold a legal distinction between them.'" *Id.* (internal citation omitted). *See also Prime*

13

*Hospitality Corp.*, 462 F.3d at 677 n. 14 ("Under Delaware law, to hold a parent corporation liable for the actions of a subsidiary pursuant to the alter ego doctrine, a plaintiff must demonstrate that the parent corporation exercises "exclusive domination and control" to the point that the subsidiary "no longer ha[s] legal or independent significance of [its] own.").

In its request that the Court consider ALW USA a "sham" or "mere conduit" for the Foreign ALW Defendants, the government relies heavily on the allegations supporting the conspiracy count in the indictment – in particular, the allegations regarding the entities' coordinated activities, and the allegations regarding the statuses and activities of their corporate executives. Having reviewed the indictment, the government's brief, and Special Agent Gauder's affidavit, they do not adequately support the government's veil piercing request. As the Supreme Court clearly set forth in *Bestfoods*, "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." 524 U.S. at 63. Thus, the fact that ALW GmbH's chief executive officer also served as an executive in two of the parent company's foreign subsidiaries does not, in and of itself, support piercing the veil in this case. Nor does the fact that the ALW Defendants marketed themselves together on the internet – as the Foreign ALW Defendants point out in their reply brief, *see* R. 150 at 12 n. 6, corporations do that with great frequency, and for a myriad of important reasons. With the exception of startup financing and contributions from ALW GmbH, ALW USA independently financed its operations, independently conducted its own audits, maintained control over its hiring and payroll decisions, and established its own commercial relationships in the United States.

Furthermore, the indictment does not allege and the government has not established a

14

connection between ALW USA and ALW Germany, ALW Beijing or ALW Hong Kong that gives rise to a veil piercing claim. In a subsection entitled "Communications Regarding Falsely-Declared Indian Honey," for example, the indictment describes alleged communications between the different subsidiaries. (Indictment at 23-25.) Rather than supporting the government's contentions, those descriptions tend to refute the proposition that the ALW subsidiaries were simply a "single entity" or that the Foreign ALW Defendants exerted "dominion and control" over ALW USA. Instead, they support the subsidiaries' statuses as separate entities. These alleged communications, as well as others described in the indictment, in Special Agent Gauder's affidavit, and in the related documents filed under seal, reveal that at no time did any of the ALW Defendants hold themselves out as possessing authority to make decisions for one another, nor did they actually make decisions for each other. In describing a specific discussion between defendants ALW USA, ALW Hong Kong, and ALW Beijing regarding the transshipment of Chinese-origin honey to India, for example, the indictment alleges, "On or about April 11, 2006, Liu emailed Fan, Gerkmann and Belten, with a copy to Marten, discussing how [the ALW Defendants] would cause Chinese-origin honey to be transhipped through India, and stated: 'I would like to suggest the [ALW USA, ALW Hong Kong, Fan, and the factory] shall reach an agreement asap so that we can start shipment already from CN [China] already next week.'" (Indictment at 24 ¶ 13.) There is no doubt that the charges contained in the indictment allege unlawful and conspiratorial conduct. They do not, however, satisfy the burden for piercing the corporate veil.

**B.    The Facts of This Case Are Distinguishable From *Chitron* and *Public Warehousing***

The government asserts that the Court should follow the district courts' holdings in

15

*Chitron* and *Public Warehousing*. Even if the Court adopted the holdings in those cases, the facts in this case are clearly distinguishable and compel a different result. Indeed, another district court rejected a similar request. *See United States v. Johnson Matthey PLC*, No. 06-CR-169 DB, 2007 WL 634269 (D. Utah Feb. 26, 2007).

In *Chitron*, a Chinese corporation opened a "purchasing office" in the United States whereby the U.S. subsidiary would procure and export electronics components for its parent company. *Chitron*, 668 F. Supp. 2d at 300. Those "electronics components" were used for military and aerospace purposes, including items defined as "defense articles" under the Arms Export Control Act, 22 U.S.C. §§ 2278 *et seq.* The indictment in that case alleged that neither Chitron-China nor Chitron-US had ever applied for a license to export defense articles. In seeking to serve Chitron-China via its U.S. subsidiary, the indictment alleged that (1) Chitron-China was integrally involved in the daily operations of Chitron-US, controlling the U.S. subsidiary's work by sending "tasking lists"; (2) Chitron-China established a toll-free number for Chitron-US in the United States that would, in fact, forward the calls to Chitron-China's offices, where Chinese employees would answer the calls; (3) that same phone system "masked outgoing calls from the Shenzhen headquarters, such that it appeared that the call was being placed from the Chitron-US office"; and (4) Chitron-China employees fraudulently identified themselves as Chitron-US employees when speaking with U.S. retailers and distributors. *Id.* at 301. Furthermore, Chitron-China made monetary transfers to Chitron-US to pay for Chitron-US's operating costs, including the salaries of Chitron-US employees. *Id.* Finally, the Court takes judicial notice of the operative Second Superseding Indictment in *Chitron* and notes that the indictment alleges repeatedly that Chitron-US's conduct was "under the direction and control of

16

[Chitron-China's executives]." *Chitron*, No. 08-CR-10386-PBS, D.Mass., Dkt. No. 82 (Second Superseding Indictment). The government has not alleged or presented remotely similar facts in this case, and the indictment contains no such allegations. In *Public Warehousing*, the district court found the entities' extensive daily interactions and several financial entanglements persuasive to permit veil piercing. The government has not demonstrated those circumstances here.

## II. The Government Has Made No Arguments Regarding Any Entity's "Control" Over ALW USA Other Than ALW GmbH

The government seeks to reach all of the Foreign ALW Defendants through ALW USA. Neither the allegations in the indictment nor the substance of the government's filings support a finding regarding ALW Germany, ALW Hong Kong or ALW Beijing's "control" over ALW USA. As such, the government has failed to meet its burden.

## CONCLUSION

For the reasons discussed above, the Court grants the Foreign ALW Defendants' motion to quash service of the summonses.

**Date:** September 26, 2011

                    **ENTERED**


                    **AMY J. ST. EVE**
                    **United States District Court Judge**

17